In the Matter of CIVIL SERVICE BAR ASSOCIATION, LOCAL 237, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Respondent, v CITY OF NEW YORK, Appellant, and HOWARD M. KATZ et al., on Behalf of Themselves and All Others Similarly Situated, Intervenors-Respondents.

First Department, February 14, 1984

**APPEARANCES OF COUNSEL**

*Mark Steven Soroka* of counsel (*Adam Ira Klein,* attorney), for respondent.

*Fay Leoussis* of counsel (*Michael Gage, John F. Grubin, Rubin R. Salz* and *Fred Kolikoff* with her on the brief; *Frederick A.O. Schwarz, Jr., Corporation Counsel,* attorney), for appellant.

*Seymour M. Waldman* of counsel (*Robert M. Stulberg* with him on the brief; *Vladeck, Waldman, Elias & Engelhard, P.C.,* attorneys), for Howard M. Katz and others, intervenors-respondents.

*Braunstein, Jacobson, Freeman & Viscomi* for Jonathan P. Blucher and others, intervenors-respondents.

#### OPINION OF THE COURT

SILVERMAN, J.

These are appeals by the City of New York from (i) a judgment of the Supreme Court (N. HELMAN, J.), entered September 19, 1977, confirming a labor arbitration award, and from (ii) a judgment of the Supreme Court (LEONARD SILVERMAN, J.), entered October 19, 1982, vacating a supplemental award in arbitration and vacating a judgment of the Supreme Court (H. KORN, J.), entered December 20, 1977, which had confirmed said supplemental arbitration award and which had vacated the judgment of September 19, 1977.

The issue in the case is the validity of a settlement of a labor dispute which was embodied in a supplemental arbitration award, and in a court judgment which vacated a prior judgment confirming a prior arbitration award.

#### THE PROCEDURAL HISTORY

The classes of employees involved are various civil service titles of attorney, there being apparently five titles or grades ranging from attorney trainee to associate attorney. These attorneys are represented by petitioner Union, Civil Service Bar Association, Local 237, International Brotherhood of Teamsters (Union).

On September 4, 1974 the city and the Union entered into a collective bargaining agreement covering the period from January 1, 1974 to December 31, 1975. Before that agreement was signed there was a certain unsigned letter agreement from John P. Finneran, Assistant Director of the Office of Labor Relations, to the director of the Union

dated July 25, 1974 (the Finneran letter), which was apparently deemed to be a rider to the collective bargaining agreement, and on which the Union based its claim. The Finneran letter provided that the city had the unilateral right to change the minimum rates for the titles attorney trainee, attorney and associate attorney, "provided that each minimum rate is changed by the same dollar amount at the same time."

The collective bargaining agreement (art III, Appendix A) itself established minimum and maximum rates of pay for the attorneys. It provided further: "Section 1. (a) This Article III is subject to the provisions, terms and conditions of the Alternative Career and Salary Pay Plan Regulations, dated March 15, 1967, as amended to date, except that the specific terms and conditions of this Article shall supersede any provisions of such Regulations inconsistent with this agreement subject to the limitations of applicable provisions of law." The Alternative Career and Salary Pay Plan Regulations referred to were general regulations promulgated by the Mayor. They provided for appointments and reinstatements to be made at the minimum basic salary, or as otherwise authorized by a certificate of the Mayor, and further provided: "In the event that a different appointment or reinstatement salary is authorized for a specific position or positions by a Certificate of the Mayor as herein provided, no other employee in a position in the same class of positions receiving a rate different from the rate authorized in such certificate shall be automatically entitled to have his salary adjusted to the rate or rates authorized in such certificate for the specific position or positions."

In March, 1975 at least one attorney, who had previously been employed as a provisional attorney, was appointed as an associate attorney, apparently at the same salary as he had been earning as a provisional which was some $3,000 above the minimum for that title. The Union took the position that this constituted an increase of the minimum; that under the Finneran letter this increase should be applicable to all employees in that grade receiving less than the new employee's salary; and that all minimums in all grades should be raised by that amount, or by the

highest amount that the salary of any newly appointed employee exceeded the minimum for that grade. (As ultimately determined by the arbitrator, this meant that all minimums would have to be increased by at least $4,200 because at least two employees had been hired at $4,200 above the minimum for their grade.)

The Union took the matter to arbitration and the arbitrator upheld the Union's position in an award dated January 6, 1977 (the original arbitration award). In that award, the arbitrator held that the appointment of the particular provisional associate attorney above the minimum was an increase in the minimum for that classification and for the other classifications involved; that others may have been so appointed above the contractual minimum; that the city should examine its records to determine which employees had been appointed above the minimum; and that all the minimums should be increased by the highest amount by which any employee's original salary exceeded the minimum, and that the city should pay the difference to all employees who were receiving less than the increased minimum.

The original award was confirmed over the city's objection by a judgment of the Supreme Court entered September 19, 1977 (the HELMAN judgment). The city served a notice of appeal from that judgment.

The city did not perfect that appeal. Instead settlement discussions took place between the representatives of the city and Union which resulted in an agreement embodied at first in a memorandum of understanding, and then in a stipulation under the caption of this case entitled in the Appellate Division. Under this stipulation of settlement there would be a lump-sum payment of $2,000 to cover the period July 25, 1974 to January 6, 1977 to all members of the bargaining unit serving in the titles attorney trainee, attorney, assistant attorney and associate attorney who were on the city's payroll on January 6, 1977, and who remained on the payroll as of the ratification and acceptance by the parties of the stipulation, except for retirees who would receive a prorated share of the lump sum based on the time served before retirement; further, there would be a $2,500 increase in salary rate effective January 1,

1978 for each member of the bargaining unit, and the contractual minimum *and maximum* salary for the titles would be $2,500 greater than the minimum and maximum prescribed in the contract for the period January 1, 1974 through December 31, 1975; and that collective bargaining for the contract effective January 1, 1978 should be based on the salary rates which reflected this $2,500 increase.

The settlement agreement was then submitted to the membership at a special meeting on December 13, 1977, as part of one package with a proposed new collective bargaining agreement for 1976-1977, as a single item. Only members of the Union in good standing at that time were admitted to the meeting. The collective bargaining agreement for 1976-1977 including the stipulation of settlement was approved by the membership.

The arbitrator, having been kept apprised of developments and apparently having participated in the discussions, was requested to make a supplemental award as a "full and equitable implementation" of the original award. He made a final supplemental award dated December 16, 1977 embodying the settlement.

This final supplemental award was then submitted to the Supreme Court for confirmation resulting in the judgment of December 20, 1977 (the KORN judgment), on consent of the Union and the city, vacating the HELMAN judgment which had confirmed the original arbitrator's award and embodying and implementing the terms of the supplemental award.

Thereafter by notice of motion dated February 2, 1978 a group of employees sought to intervene in the action as a class representing employees and former employees to set aside the KORN judgment and the supplemental award. These employees were employees who claimed that they had received better terms under the original award than under the supplemental award; some of them indeed, having resigned, might receive nothing under the supplemental award. The motion for intervention was denied at Special Term by order entered March 24, 1978. This court reversed the denial of intervention (64 AD2d 594), granted the motion to intervene and remanded the application to vacate the KORN judgment and the supplemental award to

Special Term for a hearing on the factual issues. Such a hearing was held before Justice LEONARD SILVERMAN who thereafter rendered a decision and judgment (entered October 19, 1982) sustaining the position of the intervenors. The judgment vacated the KORN judgment of December 20, 1977, reinstated the HELMAN judgment of September 19, 1977, and vacated the supplemental award. From this judgment, the city appeals.

### DISCUSSION

In the last of the judgments under review, the judgment of October 19, 1982 by Justice LEONARD SILVERMAN, the court had ruled that the supplemental award and the judgment confirming it were invalid because the arbitrator was *functus officio*. On analysis, it is our review that regardless of whether the arbitrator was *functus officio,* the settlement embodied in the supplemental award and the judgment confirming it should be sustained (and thus the judgment on decision of Justice LEONARD SILVERMAN reversed) as a settlement and in the nature of a collective bargaining agreement within the power of the Union to make. This was a group or union-wide dispute — as distinct from a grievance on behalf of a particular individual — involving an interpretation of the provisions of the collective bargaining agreement; the settlement of this dispute resulted basically in a new or amended collective bargaining agreement, which while perhaps not being equally favorable or unfavorable to each employee, as it never can be, did attempt to arrive at an equitable solution of the problem, and did not constitute a violation of the Union's duty of fair representation or a deprivation of anyone's vested rights.

It may be as intervenors suggest that a supplemental award by the arbitrator and a judgment confirming that award was necessary as a matter of form in order to circumvent the restrictions and controls on the city's financial powers by the Emergency Financial Control Board. It remains true that essentially what was involved was a consensual settlement of a collective bargaining dispute between the city and the Union. If the proceeding before the arbitrator, resulting in a supplemental award and the confirmation of that award, was part of a charade to

forestall possible objection by the Emergency Financial Control Board, that may be a matter between the Emergency Financial Control Board and the city. It does not alter the fact that there was a bona fide settlement of a dispute under a collective bargaining agreement and a resulting amended or new collective bargaining agreement which cannot be collaterally attacked because of a claim that defective mechanics were used to get them past the Emergency Financial Control Board.

### A UNION-WIDE DISPUTE AND SETTLEMENT
### RELATED TO COLLECTIVE BARGAINING
### AGREEMENTS

We note that the underlying dispute was not a grievance brought on behalf of or at the instance of any particular employee; it was a group grievance brought on behalf of "ALL ATTORNEY TRAINEES, ATTORNEYS & ASSOCIATE ATTORNEYS AFFECTED." It stated that the appointment of one Dennis O'Connor to the permanent position of associate attorney at a salary higher than the minimum constituted a unilateral raising of the minimum rate for that title to the salary at which Mr. O'Connor was appointed, and that as a result, the minimum rates for attorney trainee and attorney were thereby simultaneously raised by $3,000, and demanded that all persons in these titles receiving a salary lower than the new minimum rate should receive that salary with back pay. So far as appears, this grievance was not made at the request of any employee receiving "less than the minimum"; all employees were receiving the salary at which they were hired; thus the $3,000 (or as it later turned out, $4,200 or more) increase would constitute a windfall to those employees.

The dispute involved an interpretation of the collective bargaining agreement (and ultimately a settlement of the dispute as to that interpretation). As the intervenors' brief states, "both sides viewed the negotiations as akin to collective bargaining."

The dispute and its settlement were inextricably related to the new collective bargaining agreement about to be entered into. Indeed, as stated below, the settlement and the new collective bargaining agreement were submitted together to the membership for one vote.

Both the city and the Union had problems with respect to the original award. From the city's point of view, the award, besides being unsatisfactory as rejecting the city's interpretation and costing it money, also meant that if the award was upheld, the Alternative Career and Salary Pay Plan Regulations would be rendered inoperative, and it would be impossible for the city to appoint anyone at a salary in excess of the minimum even though the person involved was a provisional employee (or perhaps even a laid-off employee) for whom appointment at the minimum salary would mean a reduction in salary, or alternatively, the city would have to raise everybody. Further, the new minimum rates would effectively close the gap between minimum and maximum rates, thus precluding merit increases. Again, under the award presumably the most junior attorneys would receive a large lump sum while senior attorneys at or near the maximum of the grade would receive very little; the award would create problems in negotiating future contracts from which salaries set by the original award would presumably be a base. Finally, the city objected to the complexity involved in implementing the award, requiring it to search the records of each individual attorney in each of the 50 to 70 agencies to ascertain appointment dates and salaries, and to adjust the minimum rate each time for different attorneys to account for different appointments at different rates and dates.

The Union too had its problems with the original award. It had advocated an extreme position in the litigation, and the arbitrator had accepted that extreme position. The consequences were not too happy for the Union. It was not sure whether the award would be sustained on appeal. Further, it appeared that perhaps 25% to 40% of the membership would get substantially all of the benefits of the award. Again, the Union had a long-term goal to establish a step-pay plan which would provide for increases based upon length of service and promotion; the implementation of the award would in most cases essentially equalize the salaries of all employees. Further, the Union knew that the city would oppose the award strenuously, causing a lengthy delay in receipt of any benefits, and that in the meantime, the city would not conclude the contract negoti-

ations on the 1976/1977 collective bargaining agreement before resolving the arbitration dispute because the minimum pay levels in the 1976/1977 contract would necessarily depend upon increases of minimum salaries, resulting from the original award. In fact, the 1976/1977 collective bargaining agreement was not finally agreed to and submitted to the membership until December, 1977, as part of the same package with the settlement of this dispute.

Accordingly, both the Union and the city were amenable to some settlement that would meet these problems and they negotiated and arrived at the settlement which was embodied in the stipulation of settlement and later the supplemental award.

The settlement in addition to being itself an interpretation or amendment of the collective bargaining agreement of 1974/1975 was also inextricably intertwined with the 1976/1977 collective bargaining agreement, and indeed, with the collective bargaining agreement effective January, 1978. The stipulation of settlement explicitly provided "[f]or clarity, collective bargaining for the contract effective January 1, 1978 shall be based on the salary rates which reflect the foregoing $2,500 increase." The stipulation of settlement and the 1976/1977 collective bargaining agreement were submitted to the membership as: "Ratification Vote — One Item Contract — 1976/77 together with Stipulation Settlement of Pending Litigation". At the meeting "[t]he chairman explained that the vote would involve the contract for 1976-1977 as well as the City's offer."

### AUTHORITY TO SETTLE

"Central to the policy of fostering collective bargaining, where the employees elect that course, is the principle of majority rule." (*Emporium Capwell Co. v Community Organization,* 420 US 50, 62.) " 'Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents ....' *Steele* v. *Louisville & N.R. Co.,* 323 U. S. 192, 202 * * * 'The majority-rule concept is today unquestionably at the center of our federal labor policy.' 'The complete satisfaction of all who are represented is hardly to be expected. A wide range

of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.' *Ford Motor Co.* v. *Huffman,* 345 U. S. 330, 338." (*National Labor Relations Bd. v Allis-Chalmers Mfg. Co.,* 388 US 175, 180.) "Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes." (*Humphrey v Moore,* 375 US 335, 349-350.)

In the present case there is no reason to believe that the Union did not act honestly and in good faith. Some of those who proposed the settlement and voted for it would have done better if the original award were left standing than under the supplemental award. It was a union-wide collective bargaining matter. The dispute as we have said was not an individual grievance of any particular employee or employees, but a group one.

No individual employee was receiving less than the salary at which he was hired or to which he had been increased. Benefits under the original award to particular employees were thus rather in the nature of a windfall to them, and denying them those benefits did not defeat any reasonable expectations that they had before the grievance was instituted.

It was not unfair to use the original award as a lever, or a club, to obtain for all the members of the Union a more equal benefit.

The appeal from the judgment confirming the original award was still pending. "Parties obtain no vested rights in the orders or judgments of courts while they are subject to review." (*Matter of Boardwalk & Seashore Corp. v Murdock,* 286 NY 494, 498.)

The Union did not violate any legal rights of the resigned employees by excluding them from the ratification vote. This was essentially a vote on a collective bargaining agreement in which those who were employed at the time the vote was taken could participate and in which those who had resigned and thus were no longer members of the Union could not participate. The Union's by-laws provide that only members are entitled to vote at general or special

meetings; eligibility for membership is limited to employees in competitive civil service positions in the legal service of the City of New York, etc.

The authority of the Union to make settlements may appear more clearly from these procedural considerations:

Let us suppose that when the Union first learned that someone had been appointed at a salary above the minimum, it did not institute any arbitration but instead negotiated with the city, using the same argument as a lever to obtain further benefits for its members, and that as a result, without arbitration, the city and the Union agreed that all employees who were still in service on the date of the agreement would receive a $2,000 lump-sum payment and that all the salary scales would be increased by $2,500, effective at the date of the next collective bargaining agreement, January, 1978. We can see no possible question as to the power of the Union in that posture of the case to enter into that agreement, binding upon all its members. (See Administrative Code of City of New York, § 1173-4.2, subd a, par [4].)

If that be so, when did the Union lose that power? Surely, the service of the demand for arbitration did not deprive it of that power. Under the contract, only the Union had the right to bring arbitration, at least for a "grievance of a general nature affecting a large group of employees and which concerns the claimed misinterpretation, inequitable application, violation or failure to comply with the provisions of this agreement". The Union had the exclusive right to control the prosecution of the arbitration. (*Parker v Borock,* 5 NY2d 156.) Only the Union or the employer has the right to seek to vacate the arbitration award (*Matter of Soto [Goldman]*, 7 NY2d 397) and this even though individual employees contend that they are being deprived of property rights (*Chupka v Lorenz-Schneider Co.,* 12 NY2d 1, 6). Thus this settlement could have been entered into during the pendency of the arbitration.

Nor did the fact that the arbitrator had rendered his original award, or judgment entered on it, deprive the parties of their power to settle. Any case can be settled as well after award or judgment as before. Thus in *Maurer v UAW* (105 LRRM 2883) the union had ratified a new

contract which eliminated an arbitration award ordering rehiring of certain discharged employees. The court rejected arguments of dissatisfied employees that the union had violated the duty of fair representation by sacrificing objectants' interests in order to advance the interests of incumbent employees and by bargaining away objectants' rights to re-employment without giving them notice and an opportunity to present their views.

As we have said, the litigation was still pending, notice of appeal having been filed. (Indeed the present appeal includes the appeal of the city from the HELMAN judgment confirming the original award.) And there are no vested rights in judgments of courts while they are subject to review. (*Matter of Boardwalk & Seashore Corp. v Murdock,* 286 NY, at p 498.) Certainly there are no such vested rights of individual employees which can interfere with the powers of the collective bargaining agent in interpreting, enforcing and amending general provisions of the collective bargaining agreement and entering into a new one. This settlement was both an interpretation and an amendment of the existing collective bargaining agreement, and essentially part of the succeeding collective bargaining agreement, and the control of all of these was within the power of the Union and its membership.

*Abrams v Board of Educ.* (91 AD2d 618) is a particularly close application of these principles. The case involved the right of retired employees of a board of education to challenge a settlement between the board of education and the collective bargaining agent that had represented claimants-petitioners before their retirement from service. Petitioners claimed that their financial interests were ignored in the settlement of deferred salary litigation because restitution was agreed to in the form of salary increases in a new union contract taking effect after they had retired. The settlement had taken place after the union had invoked arbitration, and Special Term had directed arbitration of the issues. Petitioners argued that their claims had not been released by the stipulation of settlement because it had been executed by the board of education and the union and not by the petitioners, and because the union no longer represented them once they retired; indeed, most of

them had already retired at the time the settlement was reached. The court rejected petitioners' claims saying (at p 620): "Nothing in the record shows that the union had lost its authority to act on behalf of petitioners in pursuing their rights as accrued under the collective bargaining agreement in effect at the time of their retirement * * * As a matter of law, disputes covered by a collective bargaining agreement are to be resolved pursuant to the provisions of such agreement even if its term has expired or the union member has left his employment; such rights as he may have are derived from the very agreement that entrusts their enforcement to the union."

Judgment, Supreme Court, New York County (L. SIL-VERMAN, J.), entered October 19, 1982 should be reversed, on the law and the facts, and the application to vacate the judgment of December 20, 1977 and the final supplemental arbitration award dated December 16, 1977 denied, without costs.

Appeal from judgment, Supreme Court, New York County (N. HELMAN, J.), entered September 19, 1977 should be dismissed, without costs, as moot, in view of the foregoing determination on the appeal from the judgment entered October 19, 1982.

KUPFERMAN, J. (dissenting in part). I dissent and would remand for further proceedings. The facts in the majority opinion speak for themselves. The problem is not that the settlement was questionable, rather it is that there was a "sell-out" with respect to one class of former employees who, moreover, were excluded from voting, participating, or even attending the membership meeting which confirmed the new arrangement.

An award thus based cannot stand.

MURPHY, P. J., CARRO and KASSAL, JJ., concur with SILVERMAN, J.; KUPFERMAN, J., dissents in part in an opinion.

Judgment, Supreme Court, New York County, entered on October 19, 1982, reversed, on the law and the facts, and the application to vacate the judgment of December 20, 1977 and the final supplemental arbitration award dated December 16, 1977 is denied, without costs and without

disbursements. The appeal from the judgment of said court, entered on September 19, 1977, is dismissed as moot, in view of the foregoing determination on the appeal from the judgment entered on October 19, 1982, without costs and without disbursements.